## Joseph A. Herron, John L. George and Thomas H. Given, Executors and Trustees of James Neel, Deceased, and Nancy Neel, Appellants, *v.* William P. Wampler.

*Partnership—Termination of partnership—Debts contracted by surviving partner.*

Where a partnership has been dissolved by the death of one of the partners, and the surviving partner has continued the business with great advantage to the firm's estate, the executors of the deceased partner cannot object to a claim by a bank upon a fund arising out of real estate purchased with the money borrowed from the bank, and largely obtained for and used to protect and preserve the firm's estate during a period of great financial depression, and out of moneys loaned the firm, not upon the firm's own paper, but largely upon the paper of other parties taken in payment of the sales of the commodity owned and trafficked in by the firm.

*Partnership—Distribution of partnership estate—Mortgages.*

In distributing a fund raised by the sale of partnership real estate, some or all of which had been acquired by the surviving partner in continuing the business, the auditor commits no error in refusing to award any part of the fund to the mortgagees of the real estate, where it appears that the mortgagees made no claims upon the fund, and that the mortgages remained unaffected by anything done by the surviving partner and the representatives of the deceased partner's estate.

Argued Nov. 6, 1899. Appeal, No. 193, Oct. T., 1899, by plaintiffs, from order of C. P. No. 1, Allegheny Co., Dec. T., 1895, No. 445, overruling exceptions to auditor's report. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN, FELL and BROWN, JJ. Affirmed.

Exceptions to report of auditor, John G. MacConnell, Esq.

The auditor's findings of facts and conclusions of law were as follows:

In the early part of the year 1875, James Neel and Wm. P. Wampler formed a copartnership for the purpose of carrying on a general lumber business in McKeesport, Allegheny county, Pennsylvania. There were no written articles of copartnership between the parties relating to the copartnership business. The interest of James Neel therein was a three-fourths interest, and that of Wm. P. Wampler a one-fourth interest. The only money contributed was by James Neel. Mr. Wampler's interest was to be paid for out of profits of the partnership. Mr. Wampler was the active partner and attended to the business without any interference from Mr. Neel. Mr. Neel was a passive, inactive and quiet partner. On July 24, 1892, Mr. James Neel died, having first made his last will and testament, the plaintiffs in this proceeding being the executors and trustees named in the will. On the      day of      , 1892, letters testamentary under the will were granted to said plaintiffs as executors.

By the death of James Neel on July 24, 1892, the partnership of Neel & Wampler, by the act of God, and the operation of law, expired and ended. From the date of Mr. Neel's death, July 24, 1892, until April 13, 1896, Mr. Wampler carried on the business, conducting it in the same manner as he did during Mr. Neel's life, claiming he carried it on in pursuance of this portion of Mr. Neel's will, viz: " With the consent and approval " of the executors and trustees of Mr. Neel. The weight of the evidence to my mind does not bear out or support this theory of the case. On the contrary, it appears that they urged Mr. Wampler to close up the partnership business as speedily as possible, but so as not to be injurious to the interest of both parties. The business not being closed as requested, the agreement of February 19, 1895, was entered into. Under this agreement and within less than a month after it was entered into, the appraisers named therein proceeded to and did appraise the value of the real estate in accordance with its provisions, and the trustees and Mr. Wampler took certain portions of the real estate, and deeds were passed between the parties relative to

the real estate taken by the respective parties. Mr. Wampler still continued to carry on the partnership business, buying lumber and material, running the mill, keeping the firm name signs up at the old place of business, buying lumber and other material in the firm name, carrying the firm account in the First National Bank of McKeesport, Pa., in the firm name, signing the firm name to checks, notes and other evidence of debt, and indorsing the firm name on back of notes given the firm.

On October 24, 1895, the executors and trustees, not being able to have Mr. Wampler cease business, filed their bill in equity under which the accounts have been filed and distribution is being made. On the 25th day of November, 1895, Mr. Wampler filed an answer to the bill. Several efforts were made by the executors under this bill to force Mr. Wampler to cease the firm business and file an account of his action from the time of Mr. Neel's death up to said period, without much success until April 13, 1896, when the paper called the "Stipulation" was signed in open court, and during the time a hearing was being had by the court in the case.

On September 4, 1897, upon application of the executors and trustees, the court appointed "The Union Trust Company of Pittsburg, Pennsylvania," receiver of all the property, real, personal and mixed, of the partnership lately carried on by James Neel, now deceased, and W. P. Wampler, under the name of Neel & Wampler. From the date of Mr. Neel's death, July 24, 1892, Mr. Wampler, in the face of the protests of the executors, in the face of the agreement of February 19, 1895, in the face of the bill in equity filed at the above number and term, and of the proceedings being had thereunder, and in the face of the stipulation of April 13, 1896, continued carrying on the business of the firm, creating debt and expense, by indorsements and otherwise, up until September 1, 1897, when the court was compelled to step in and, by the strong arm of the law, took possession of the remaining assets of the firm and placed them in the hands of a receiver.

It is true that, at the time of the death of Mr. Neel, there was a strong financial pressure upon the business community of the United States, and this business depression continued for some two to three years. To have forced the assets of the

firm on the market during this business depression would have been ruinous to both parties interested. It was good, wise and prudent judgment on the part of Mr. Wampler, not only to try and carry these assets through these times and until such times as would justify the same being placed on the market in safety, and he did it. To do this, however, he had to have means, and he had to depend upon his own ingenuity and skill to do this, receiving no help or assistance from the executors or trustees excepting at one time when the firm of Alexander & Company, of Monongahela city, Pennsylvania, of which firm Mr. Joseph A. Herron, one of the executors and trustees, is a member, discounted the firm's paper to the extent of some $9,000, and which was subsequently paid out of and from the sale of some of the firm's real estate. During all this period of time Mr. Wampler was a member of the board of directors of the First National Bank of McKeesport, Pennsylvania. He did all the firm's business with this bank. It discounted paper in large sums upon the faith and credit of the firm name, largely as indorser upon paper taken in payment of moneys due the firm, the money thus obtained being credited to the firm upon the books of the bank, checked against by Mr. Wampler, for the use of the firm in its business generally, and for the payment of some of the real estate in question, payment on account of mortgages, both principal and interest, repairs to this real estate, taxes, insurances, municipal assessments, etc., all of which was greatly to the benefit of the estate of James Neel, deceased. Some of the officers of the bank testify that this line of discount was given by reason of the fact that they were to some extent led to believe that Mr. Wampler was carrying on the business in pursuance of the authority granted the executors and trustees under Mr. Neel's will; partly from the fact that the signs and other evidence about the mill and place where the business had been carried on in Mr. Neel's lifetime were the same; partly from the fact that Mr. Wampler continued doing business just as he had been doing whilst Mr. Neel was living, and partly that they had no notice from the executors and trustees that the partnership had ceased or was dissolved.

The debt of the firm of Neel & Wampler to the bank on July 24, 1892, the date of Mr. Neel's death, on July 25, 1892, the day immediately following his death, and on April 13, 1896,

the date of the filing of the stipulation in open court, as indorsers and as makers, was as follows, viz:

| | | | |
|---|---|---|---|
| July 24, 1892. | As indorsers, . | . $35,790.59 | |
| | As makers, | . 12,150.00 | |
| | | | $47,940.59 |
| July 25, 1892. | As indorsers, . | . $35,739.64 | |
| | As makers, | . 12,150.00 | |
| | | | $47,889.64 |
| April 13, 1896. | As indorsers, . | . $62,656.33 | |
| | As makers, . | . 9,200.00 | |
| | | | $71,856.33 |

In a period of three years, eight months and nineteen days, the liability of the firm as makers of notes had decreased from $12,150 to $9,200, or $2,950. During the same period of time its liability by reason of indorsements had increased from $35,790.59 to $62,656.33, or $26,865.74; the actual increase of liability being $23,915.74. I find as a fact from the date of Mr. Neel's death down to the time of the appointment of the receiver, Mr. Wampler had paid out on account of the real estate totals, purchase money, $15,458.86; repairs, $6,258.78; taxes, $14,773.63; water rents, $796.81; insurance, $1,636; payments on mortgages, $18,828.66; interest on mortgages, $6,251.84; plumbing, $660.10; municipal assessments, $2,157.38 (No. 12); payments made of either principal or interest on interest bearing debts represented by notes of Neel & Wampler, $24.975; lumber and other materials purchased by Mr. Wampler, $27,582.58; total, $119,379.64.

From a most careful and painstaking search of the books of the firm as kept by Mr. Wampler, and from the exhibits taken therefrom and submitted to the court, it is beyond all controversy that all the moneys received by the firm from the bank upon the foregoing notes went into the business and was paid out in connection with it; that the purchase of real estate by Wampler, payment of the purchase money for the same, payment of mortgages, principal and interest, taxes, repairs, insurance, municipal assessments, was for the benefit of the firm, preserved the same to the estate, and has resulted in great benefit and gain, not only to the firm but to the estate of James

Neel, as well as to Mr. Wampler. These facts and results, taken in connection with the wording of the agreement of February 19, 1895, and of the stipulation of April 13, 1896, throw around this claim of the bank such equities that the claim should be allowed, and I therefore have allowed it. In allowing this claim I do not for one moment forget or overlook the strict letter of the law bearing upon partnerships such as this one was, that by the act of God and operation of law, the partnership ceased and ended upon Mr. Neel's death, and that the plain duty of the surviving partner is to collect the assets of the partnership, receive and receipt for payments, pay and settle partnership debts, settle and wind up the partnership business and distribute the net surplus among the parties entitled to it. Nor do I forget that the law is that none of the partners can create any new contracts or obligations binding upon the partnership; none of them can buy or sell or pledge goods on any account therefor; none of them can indorse or transfer the partnership securities to third parties, or in any way make their acts the acts of the partnership. And it is true that the law will not permit the estate of a deceased partner to become liable for debts contracted after his death, unless distinctly made so by the clear language of the partnership agreement, or by the will of the deceased. This case differs from the above principles. If the contention in this part of the proceeding under this bill in equity was between the partners, then this rule would prevail, and I would not hesitate a moment to rule that the surviving partner was controlled by them. The controversies between the partners, so far as the auditor is concerned, have been found and reported to the court. This, however, is a claim by a creditor upon a fund arising out of real estate, largely obtained for and used to protect and preserve, during a period of great financial depression, the estate of the firm, and out of moneys loaned the firm, not upon the firm's own paper, but largely upon the paper of other parties taken in payment of the sales of the commodity owned and trafficked in by the firm. Under all these facts and circumstances the claim of the bank is surrounded and protected by such equities, that I feel that the claim should be allowed.

With reference to the legal question raised by the learned counsel for the bank, that executors and trustees, to escape lia-

bility from payment of firm debts, must give notice of the dissolution of the firm, and bring this notice to the knowledge of all persons that have dealt with the old firm, I cannot agree altogether with him on this point, even as a dry abstract legal proposition. I do not agree with him as to its being absolutely correct. On the contrary, by death, the act of God, and by operation of law, the partnership became dissolved, unless provided for otherwise by the agreement of the copartners, and those dealing with the late firm take notice of such dissolution and must act accordingly; otherwise the legal representatives of the dead partner might find the estate coming into their hands swamped and destroyed, as they might, and in all probability would, or could have no knowledge as to whom the firm dealt with in the lifetime of the deceased partner. They might be in a position not to be able to obtain the knowledge necessary to bring this notice home to all parties, and it would, therefore, be not only a hard, but a harsh and cruel rule, wiping away a man's estate after his death, by reason of the fact that his legal representative did not bring home notice to one or more persons with whom the firm dealt in the lifetime of the deceased partner.

Mr. Douglass offered in evidence as claims on this fund the various mortgages that are liens upon some of the real estate; some of the real estate being in the possession of the trustees, some in the hands of Mr. Wampler, taken under the agreement of February 19, 1895, and the remainder is now, under the receiver's sale, owned by the trustees. Notice of the meeting of the auditor for the distribution of this fund was sent to the different holders of these mortgages. None of the mortgagees appeared in person before the auditor, or made claim to be paid out of the fund. Some of the mortgagees notified the auditor personally that they preferred that no interference be made with their security. As the mortgagees are not before the auditor as claimants upon the fund, I have not considered that they or their claims are before me, and do not consider them as claimants upon the fund, and therefore have not made any allowance to them on account of their respective mortgage debt. This leaves the real estate now owned by the trustees and Mr. Wampler just as it was when it was purchased by the different parties, namely, subject to the mortgage debt upon each piece of property, and which they respectively will have to take care of.

On exceptions the court found the auditor's findings and conclusions correct, and confirmed his report.

*Error assigned* was the order of the court.

*H. Walton Mitchell,* with him *Lyon & McKee, Knox & Reed* and *Edwin W. Smith,* for appellants.—A surviving partner has power to collect the assets of a partner, receive and receipt for payments, pay and settle partnership debts, settle and wind up the partnership business and distribute the net surplus among the parties entitled to it. The acts, admissions and acknowledgments of a surviving partner are binding upon the firm only with respect to property in his hands: Garretson v. Brown, 185 Pa. 453; Story on Partnership, sec. 322.

Under the common law a surviving partner could not give a firm note even for a pre-existing debt: Caldwell v. Stileman, 1 Rawle, 216; 7 Am. & Eng. Ency. of Law, 1159.

With respect to the direct liability of the estates of the deceased and creditors, it may be taken as a general proposition that the estate of the deceased partner is not liable to third parties for what may be done after his death by the surviving partners: Lindley on Partnerships, 579.

This principle has been modified in Pennsylvania from the time of Davis & Desauque, 5 Wharton, p. 538. In this case it was said: " In general, to him (the surviving partner) is given all power which may be necessary for the final settlement of the concern. He cannot enter into any new obligation, but his authority extends only to those contracts which may be consistent with the trust."

And further, he may borrow money for the purpose of paying debts of the firm: McCowin v. Cubbison, 72 Pa. 358; Ward v. Tyler, 52 Pa. 397; Siegfried v. Ludwig, 102 Pa. 547; Fulton v. Central Bank of Pittsburg, 92 Pa. 115; Bolles on Pa. Law of Negotiable Instruments, 241.

The foregoing applies altogether to debts as existing at the time of the death of one of the partners. The general principle stated at first, forbidding the creation of new debts by surviving partners, has not been changed in this state. We fail to discover any extension of his rights or power beyond the giving and renewing notes to liquidate the partnership indebtedness as it existed at the time of the death of the copartner.

*J W. Bailie*, for appellee.—One who holds himself out, or knowingly suffers himself to be held out, as partner, is responsible, whether in point of fact a partner or not: Kirk v. Hartman & Co., 63 Pa. 97.

Where a partnership is continued after dissolution, the firm being still in possession of its assets, the surviving partner has implied authority to make partnership notes, and if the continuance was with the knowledge of copartners, their permission may be presumed: Hickman v. Melcher, 1 Dist. Rep. 181; Meyran v. Abel, Smith & Co., 189 Pa. 215.

OPINION BY MR. JUSTICE BROWN December 30, 1899:

This appeal is from a decree confirming the report of an auditor making distribution of moneys in the hands of the receiver of the late firm of Neel & Wampler. The report exhibits great care by the learned auditor in considering and passing upon the matters brought before him; and in awarding a dividend on the claim of the First National Bank of McKeesport he made a proper discrimination between it and ordinary indebtedness which a surviving partner undertakes to incur in the firm's name after its dissolution by the death of one of its members. The evidence in connection with the bank's claim is intelligently reviewed and the findings of fact, fully justified, will not be disturbed. Upon the facts so properly found the auditor's judgment as to the legal status of this claim on the fund before him was correct. No good purpose can be served by our calling attention to the evidence in detail and discussing the legal and equitable rights of the bank, for the learned auditor has done his work so well that we refer the appellants to it, as furnishing all the reasons why the bank's claim was properly allowed. If we believed it to be needful to give our own, we could not tell them better than in the following words of the auditor:

" From a most careful and painstaking search of the books of the firm as kept by Mr. Wampler, and from the exhibits taken therefrom and submitted to the court, it is beyond all controversy that all the moneys received by the firm from the bank upon the foregoing notes went into the business and was paid out in connection with it; that the purchase of real estate by Wampler, payment of the purchase money for the same,

payment of mortgages, principal and interest, taxes, repairs, insurance, municipal assessments, was for the benefit of the firm, preserved the same to the estate, and has resulted in great benefit and gain, not only to the firm, but to the estate of James Neel, as well as to Mr. Wampler. These facts and results, taken in connection with the wording of the agreement of February 19, 1895, and of the stipulation of April 13, 1896, throw around this claim of the bank such equities that the claim should be allowed, and I, therefore, have allowed it.

" In allowing this claim I do not for one moment forget or overlook the strict letter of the law bearing upon partnerships such as this one was, that by the act of God and operation of law the partnership ceased and ended upon Mr. Neel's death, and that the plain duty of the surviving partner is to collect the assets of the partnership, receive and receipt for payments, pay and settle partnership debts, settle and wind up the partnership business and distribute the net surplus among the parties entitled to it. Nor do I forget that the law is, that none of the partners can create any new contracts or obligations binding upon the partnership, none of them can buy or sell or pledge goods on any account therefor, none of them can indorse or transfer the partnership securities to . third parties, or in any way make their acts the acts of the partnership. And it is true that the law will not permit the estate of a deceased partner to become liable for debts contracted after his death unless distinctly made so by the clear language of the partnership agreement or by the will of the deceased.

" This case differs from the above principles. If the contention in this part of the proceeding under this bill in equity was between the partners, then this rule would prevail, and I would not hesitate a moment to rule that the surviving partner was controlled by them. The controversies between the partners, so far as the auditor is concerned, have been found and reported to the court. This, however, is a claim by a creditor upon a fund arising out of real estate, largely obtained for and used to protect and preserve, during a period of great financial depression, the estate of the firm, and out of moneys loaned the firm, not upon the firm's own paper, but largely upon the paper of other parties taken in payment of the sales of the commodity owned and trafficked in by the firm. Under all

these facts and circumstances the claim of the bank is surrounded and protected by such equities that I feel that the claim should be allowed."

The disallowance of the claims made on various mortgages need not be discussed further than to say that they were all properly disallowed. None of the mortgagees appeared as claimants upon the fund, and any allowance upon these claims presented by counsel for the appellee could not be sustained on legal or equitable grounds. The mortgages remained unaffected by anything done by Wampler or the trustees, and the respective owners of the properties bound by them must make provision for their payment. The assignments of error on this point do not seem to be pressed.

The court below, believing the auditor's findings of fact and conclusions of law to have been correct, formally confirmed his report, and in overruling all the assignments of error we do so for the same reason.

Decree affirmed and appeal dismissed at the cost of appellants.